IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal Action No. 7:23-cr-00013 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ANDREW BRADLEY GEARHEART, | ) | By:  Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

On July 14, 2023, a jury found Defendant Andrew Bradley Gearheart guilty of aiding

and abetting the unlawful acquisition of a Taurus 9 mm pistol from a federally licensed gun

dealer—a so-called "straw purchase"—in violation of 18 U.S.C. § 922(a)(6) and 18 U.S.C. § 2.

This case is currently before the court on Gearheart's motions for judgment of acquittal or a

new trial. Having carefully reviewed the entire record and the parties' written submissions, the

court concludes that that the government presented more than sufficient evidence to sustain

the guilty verdict, and, separately, that a new trial is not warranted. Accordingly, the court will

deny both motions.

## I.

At trial, the government presented the testimony of five witnesses.[1] The first, Officer

Sam Cochran of the Roanoke City Police Department ("RPD"), testified about recovering the

9 mm pistol at issue on April 3, 2021, during an unrelated criminal investigation. (Trial Tr.

Vol. 1, at 139:18–141:19 [ECF No. 153].) Next, ATF Special Agent Adam Moody ("SA

---

[1] Based on the parties' stipulation, the government recalled one of these witnesses, ATF Special Agent Adam Moody, at the close of its case-in-chief to explain how the agents had documented multiple pretrial interviews of Gearheart's uncharged accomplice, Lindsay Sellers-Sherry, and the alleged inconsistencies in her accounts. (Trial Tr. Vol. 2, at 43:15–63:13 [ECF No. 154].)

Moody") testified about how he had identified the individual who had originally purchased the firearm. (*See id.* at 145:10–147:2.) From the serial number on the firearm, SA Moody determined that it had been acquired from a Roanoke gun store, Doomsday Tactical, more than four months before it was recovered by Officer Cochran and RPD. SA Moody further testified that Doomsday Tactical is an ATF-licensed federal firearms licensee ("FFL"), and the government offered a copy of the store's license, which the court admitted without objection. (*Id.* at 147:16–148:11; Gov't Exs. 4, 4A.) Based on that information, SA Moody explained that he had visited Doomsday and reviewed the records of the sale. From the ATF Form 4473, the federal background check form required for all gun-store purchases, and the sales receipt on file at the store, SA Moody learned the original purchaser of the Taurus 9 mm was a woman named Lindsay Sellers-Sherry. (Trial Tr. Vol. 1, at 148:22–23.)

SA Moody then testified about his subsequent interview of Ms. Sherry at her residence in Roanoke. During that interview, Ms. Sherry admitted that she purchased the firearm with money that Gearheart, whom she characterized as a family friend, had provided. (*See id.* at 152:18–19, 183:2–3.) SA Moody then described his interview of Gearheart at his apartment. SA Moody testified that, when he asked Gearheart about the firearm at issue, he admitted to having received it from Ms. Sherry after asking her to help him acquire it. Gearheart told Moody that he enlisted Ms. Sherry in this effort because he was only 19 years old and, accordingly, was not permitted to purchase a firearm from an FFL.[2] (*Id.* at 154:15–156:11.) As recounted by SA Moody, Gearheart added that he told "Ms. Sherry what type of gun he was

---

[2] Ironically, and as Gearheart established (and reiterated) at trial, the law permitted Gearheart to possess a gun, make a private purchase of a firearm, or receive one as a gift.

looking for and how much he had to spend. Then he went with her to Doomsday Tactical where she purchased the gun for him, and he provided the funds." (*Id.* at 156:3–7.) According to SA Moody, Gearheart admitted that he remained in Ms. Sherry's vehicle while she went inside the gun store. (*Id.* at 156:14–21.) When SA Moody asked Gearheart what happened to the firearm after he had acquired it from Ms. Sherry, Gearheart initially responded that he had sold it two months later, in January 2021, but he quickly changed his story and claimed that it had been stolen. (*Id.* at 157:4–11.)

After SA Moody, the government called Ms. Sherry, who substantially corroborated Gearheart's admissions regarding his primary role in the acquisition of the firearm. Specifically, Ms. Sherry confirmed that Gearheart had asked her to help him obtain a firearm; that she had driven him to Doomsday Tactical; that Gearheart had shown her the make and model of the pistol he wanted her to acquire on his phone and handed her approximately $500 cash to cover the purchase price; that she had gone inside the gun store by herself while Gearheart waited in the car; that, while inside Doomsday, she had filled out ATF Form 4473, falsely attesting that she was the actual purchaser of the firearm; and that once the sale was completed and she had returned to her car, she handed the 9 mm pistol to Gearheart along with approximately $200 in cash left over from the purchase.[3] (*Id.* at 185:20–197:2.) Ms. Sherry also identified the

---

[3] As Gearheart points out, and as he demonstrated through vigorous cross-examination at trial, when Ms. Sherry was first interviewed by SA Moody, she initially claimed that she had given the gun to Gearheart before admitting, consistent with her later testimony at trial, that Gearheart had picked it out and paid for it. In a series of text messages with Gearheart around the time they were initially interviewed by SA Moody, Sherry also described the transaction at issue as a gift. (*See* Gov't Ex. 7G.) Based on this contradictory evidence, the court granted Gearheart's request, over the government's objection, to instruct the jury that it is legal to purchase a firearm from an FFL as a *bona fide* gift for another person. (*See* Jury Instrs. No. 24 [ECF No. 131]; Trial Tr. Vol. 2, at 111:2–4 [ECF No. 154].) In addition, because there were some discrepancies in Sherry's pretrial statements about the exact point in time that Gearheart had provided money for the pistol—*i.e.*, prior to Ms. Sherry entering Doomsday versus after she had completed the purchase and handed him the gun—the court further instructed the jury (again, over the government's objection) that, in Virginia, it is legal for a non-FFL (*e.g.*, Ms.

Form 4473 that she had completed in connection with the purchase, and it was admitted without objection. (*Id.* at 193:6; Gov't Ex. 6.)

The government then showed Ms. Sherry a series of text messages that she had exchanged with Gearheart shortly after Ms. Sherry and Gearheart were interviewed by SA Moody. In response to Ms. Sherry's text asking what he had done with the gun, Gearheart acknowledged that he had sold it. (Gov't Ex. 7A.) But later in the same text exchange, Gearheart informed Sherry that he had told SA Moody that the gun had been stolen, but only after initially admitting that he had sold it: "I should've said someone broke in an[d] stole it but I was[n't] thinkin[g] an[d] I was scared cause they came here fast asab[.]" (Gov't Ex. 7D.) When Ms. Sherry responded that he needed to tell the agents the truth, Gearheart doubled down, claiming that, in fact, he hadn't sold the gun and that it had been stolen from his apartment. (Gov't Ex. 7E.) As part of this same exchange, apparently concerned that the gun had been recovered from a crime scene, Gearheart also wrote: "I didn't ask cause I ain't gaf nor did it have [to do with] me but do you know what the crime was[?] . . . . [I know] how people are with guns[;] somebody's fingerprints are gonna be on that gun[.]" (Gov't Ex. 7C– D.)

The government's final witness was the current manager of Doomsday Tactical, Colton Smallwood. Mr. Smallwood testified that Doomsday is, in fact, an FFL, and that in his role as store manager, he is "[r]esponsible for the accurate acquisition and disposition of firearms and recordkeeping." (Trial Tr. Vol. 1, at 243:19–244:14.) In addition, Smallwood explained that he

---

Sherry) to transfer a firearm to an individual between the ages of 18 and 20. (*See* Jury Instrs. No. 24; Trial Tr. Vol. 2, at 111:8–10.)

is the "responsible person" listed on the FFL license, meaning that he is the person legally obligated to ensure that Doomsday maintains complete and accurate records of all gun sales, including paperwork required by Virginia state law (*i.e.*, Virginia State Police Form 65), as well as federal law (*i.e.*, ATF Form 4473). (*Id.* at 244:13–245:13.)

Smallwood then described the standard protocols that Doomsday employees follow when conducting firearms transactions, explaining in detail the various parts of the ATF Form 4473 at issue (Gov't Ex. 6) and the detailed information that must be provided, both by the prospective gun buyer and the store employee who handles the sale, on that form.[4] (Trial Tr. Vol. 1, at 245:14–250:3.) As to question 21-A, which asks the prospective buyer whether she is the actual purchaser of the firearm, Smallwood explained that if the buyer answers "no," Doomsday is prohibited from completing the sale. (*Id.* at 249:24.) In response to the government's follow-up question about how Doomsday confirms that the person filling out the form and paying for the firearm is the actual purchaser, Smallwood responded, "You have to use your best judgment, but ultimately you're relying on the customer to tell you the truth." (*Id.* at 250:2–3.)

Following the government's case-in-chief, Gearheart moved for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. In so doing, Defendant argued: (1) that the government had failed to present sufficient evidence that he had aided and abetted Ms. Sherry's false statement on ATF Form 4473; and (2) that the government had failed to

---

[4] As discussed in more detail below, a Doomsday employee named Bradley Ashworth assisted Ms. Sherry with the sale, and Ashworth completed the FFL-designated portions of the Form 4473 on behalf of Doomsday and transmitted the necessary forms to federal and state authorities for the background check. Mr. Smallwood, who was on duty at the time but not directly involved in the transaction, testified that he had a vague recollection of Ms. Sherry and the sale at issue.

establish that the straw-purchase at issue involved an FFL. After hearing argument from the parties, the court denied the Rule 29 motion as to the first ground, explaining in detail that, taking the evidence in the light most favorable to the government, the government had presented direct and circumstantial evidence that Gearheart had encouraged Ms. Sherry to misrepresent herself as the actual purchaser of the firearm. (Trial Tr. Vol. 2, at 82:7–86:7.) The court, however, reserved its decision on the second aspect of Gearheart's Rule 29 motion, proceeded with the remainder of the trial, and submitted the case to the jury. (*Id.* at 86:8–11.)

After the jury returned a guilty verdict, the court entered an order directing the parties to file written briefs on Gearheart's second Rule 29 argument. (*See* ECF No. 137.) Consistent with that order, Gearheart filed a memorandum addressing the outstanding Rule 29 issue and moving for a new trial on additional grounds discussed in detail below. (ECF No. 160.) The government filed a written response, and Gearheart filed a reply. (ECF Nos. 164, 167.) Both motions are now ripe for decision.[5]

## II.

In support of the reserved portion of his Rule 29 motion, Gearheart argues that the government failed to prove that Ms. Sherry's false statement—that she was the actual purchaser of the firearm—was made to an FFL, an element of the charged offense. According to Gearheart, any individual who engages in firearms dealing, including employees of a business operating as an FFL, must obtain a separate FFL license or otherwise be listed on his employer's license as a "responsible person." Insofar as the government failed to present any

---

[5] The court dispenses with oral argument because the pertinent facts and legal arguments are adequately set forth in the trial transcript and the parties' post-trial briefs and it would not aid the decisional process.

evidence that Bradley Ashworth, the Doomsday Tactical employee who assisted Ms. Sherry with the purchase and completed portions of the Form 4473 at the time of the sale on behalf of Doomsday, is himself an FFL or is otherwise listed as a "responsible person" on Doomsday's license, Gearheart contends that the government failed to prove that Ms. Sherry made a false statement to an FFL, as required to prove a violation of 18 U.S.C. § 922(a)(6). (*See* Def's Mot. at 9–11 [ECF No. 160].)

As to his second motion, Gearheart argues that "[t]hree errors plagued Mr. Gearheart's ability to receive a fair trial." (*Id.* at 12.) First, he contends that the court erred in refusing to provide his proposed defense-theory instruction. (*Id.*) Second, he asserts that the verdict form "incorrectly implied that the jury must be convinced of Mr. Gearheart's innocence by proof beyond a reasonable doubt to find [him] not guilty." (*Id.*) And third, Gearheart argues that the government "exploited" the court's pretrial ruling limiting evidence of the firearm's recovery to "an unrelated criminal investigation" to prejudice the jury against him. (*Id.*)

### A. Motion for Judgment of Acquittal: False Statement *to an FFL*

Rule 29 provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). This Rule further authorizes district courts to reserve judgment on the motion until the jury returns its verdict. Fed. R. Crim. P. 29(b). When the court elects to defer its decision until

after the verdict—as it did in this case—the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." *Id.*

In considering a Rule 29 motion, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (emphasis in original). In so doing, "a reviewing court makes a limited inquiry tailored to ensure that a defendant receives the minimum that due process requires: a 'meaningful opportunity to defend' against the charge against him and a jury finding of guilt 'beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 314–15 (1979)). "That limited review does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Jackson,* 443 U.S. at 319)).

To survive a Rule 29 motion, "[t]he government may rely on circumstantial evidence and inferences, but it still must prove each element of an offense beyond a reasonable doubt." *United States v. Rodriguez-Soriano*, 931 F.3d 281, 286 (4th Cir. 2019). In determining whether the government has met its burden, the court must "assume that the jury resolved all contradictions in the testimony in [its] favor[,]" and "where the evidence supports differing reasonable interpretations, the jury will decide which interpretation to accept." *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006).

To convict Gearheart of aiding and abetting a straw purchase in violation of 18 U.S.C. § 922(a)(6), the government had to prove three elements: (1) that Ms. Sherry, the original straw purchaser, acquired the firearm at issue from an FFL; (2) that, in so doing, she knowingly

made a false or fictitious oral or written representation intended to deceive that FFL; and (3) that this false statement was material to the lawfulness of the sale. *United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996).

Gearheart focuses his Rule 29 argument on the first element, arguing that the government failed to prove at trial that Bradley Ashworth, the Doomsday employee who assisted Ms. Sherry with the sale and who signed the Form 4473 on behalf of Doomsday, was authorized to do so. According to Gearheart, each employee of a federally licensed firearms dealer who, as part of his general duties, handles and sells firearms to customers, must either hold an individual license or be listed on the store's license as a "responsible person," as that term is defined under the applicable regulations. Insofar as it failed to produce any evidence that Bradley Ashworth is himself an FFL or was listed on Doomsday's license as a "responsible person," Gearheart contends that the government fell short of proving that Ms. Sherry, in fact, purchased the gun at issue from an FFL. But Gearheart's attempt to graft the licensure status of an individual salesclerk onto the first element of 18 U.S.C. § 922(a)(6) fails as a matter of law.

First, as the government correctly explains, the only federal firearms dealer at issue in this case is Doomsday Tactical, a Virginia limited liability company. (Gov't Resp. at 4 [ECF No. 164].) This type of corporate entity plainly qualifies as a "dealer" under federal law. *See* 18 U.S.C. § 921(a)(1), (11) (defining "dealer" to be "any person engaged in the business of selling firearms at wholesale or retail" and defining "person" to include corporations, companies, partnerships, and other business entities). And while federal law obligates business organizations that are in the business of selling firearms, like Doomsday, to obtain a federal

license, *see* 18 U.S.C. § 923(a), no statute or regulation implies, let alone requires, that individual employees of these corporate entities must themselves be FFLs to handle or sell firearms as part of their employment.

Second, despite Gearheart's argument to the contrary, a store clerk (like Mr. Ashworth) is not *ipso facto* a "responsible person" under ATF regulations such that he is required to be listed on his employer's license. Under well-established ATF regulations, all corporate FFLs must designate a responsible person, defined as a "any individual possessing, directly or indirectly, the power to direct or cause the direction of the management, policies, and practices of the Corporation, Partnership, or Association, insofar as they pertain to firearms." ATF Form 7 at 6; *see also* 27 C.F.R. § 478.47. Any person affiliated with the FFL who meets this definition must be listed on the entity's FFL application and is subject to additional vetting by the ATF. But not every employee of a gun store is a responsible person as that term is defined. Instead, under the appliable regulations, a responsible person includes any individual who, by virtue of his ownership interest, supervisory responsibilities, or *de facto* authority, controls or substantially influences the management, policies, and general practices of the FLL. *See Gossard v. Fronczak*, 206 F. Supp. 3d 1053, 1061–62 (D. Md. 2016) (explaining that, under the applicable regulations, any individual affiliated with a federally licensed FFL—as an employee or otherwise—must have the ability to control or influence, directly or indirectly, the management, policies, and business affairs related to the acquisition and subsequent disposition of firearms to be considered a "responsible person"); *MEW Sporting Goods, LLC v. Johansen*, 992 F. Supp. 2d 665, 680 (D. Md. 2014) (holding that the wife of the owner of an FFL constituted a "responsible person" because she managed the day-to-day affairs of the gun

store and regularly directed, or influenced, major business and personnel decisions and store policies); *United States v. 1,922 Assorted Firearms & 229,553 Rounds of Assorted Ammunition*, 330 F. Supp. 635, 638 (E.D. Mo. 1971) (concluding that an individual employee of an FFL who conducted illicit firearms sales after hours and outside the presence of the store manager was not a "responsible person" because he did not control the management, policies, and practices of the business). Accordingly, the fact that an FFL's employee regularly handles and sells firearms as part of his general duties does not make him a responsible person unless he also serves as a principal or manager of the business. The government therefore did not bear the additional burden of establishing that the Doomsday employee who assisted Ms. Sherry with the sale was listed as a responsible person to satisfy the first element of 18 U.S.C. § 922(a)(6).

Correctly framed, to convict Gearheart of aiding and abetting a violation of 18 U.S.C. § 922(a)(6), the government had to prove that Ms. Sherry acquired a firearm from Doomsday Tactical, which, at the time of the sale at issue, was an FFL. The government easily met its burden in this regard. As detailed above, Ms. Sherry testified that she drove to Doomsday, entered the store, selected the pistol, filled out the required paperwork, and paid with cash. The case agent, SA Moody, testified that Doomsday was a federally licensed firearms dealer, and the government introduced copies of its license—both the ATF's copy and a photograph of the signed copy on display in the store—into evidence. (Trial Tr. Vol. 1, 147:16–148:11; Gov't Exs. 4, 4A.) Finally, Doomsday's manager, Colton Smallwood, testified that the store is an FFL, "engaged in selling firearms at retail[.]" (Trial Tr. Vol. 1, 244:7–10.) Smallwood also confirmed, when shown the Form 4473 completed by Ms. Sherry in connection with this sale, that a Doomsday employee had signed the requisite box on that form, and that Doomsday

had sold the purchaser, Ms. Sherry, the pistol at issue. (*Id.* at 255:8–9, 258:15–18.) In sum, when viewed in the light most favorable to the government, the evidence was more than sufficient to sustain Gearheart's conviction.[6] His Rule 29 motion will be denied.

## B. Motion for New Trial

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). But a district court "should exercise its discretion to grant a new trial sparingly," and a jury verdict should not be disturbed except in the rare case when the evidence "weighs heavily" against it. *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (cleaned up). "[I]n deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government[,]" and it "may evaluate the credibility of the witnesses." *United States v. Miller*, 41 F.4th 302, 315 (4th Cir. 2022). At bottom, "a new trial is warranted only if the verdict is against the clear weight of the evidence, based upon false evidence, or will result in a miscarriage of justice." *United States v. Mallory*, 988 F.3d 730, 739 (4th Cir. 2021) (citing *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014)).

Gearheart's motion for new trial is predicated, in part, on two alleged errors by the court. First, he contends that the court erred in sustaining the government's objection to his

---

[6] Gearheart also contends that the government failed to establish that Bradley Ashworth "had the authority to act under Doomsday' firearm's license." (Def.'s Reply Mem. pg. 2, Sept. 8, 2023 [ECF No. 167].) The court cannot agree. Colton Smallwood testified that "the employee at Doomsday Tactical who's initiated the firearms sale" is responsible for completing part of the ATF Form 4473, that Doomsday's "employee sign[ed] block 35" of the form, and it is undisputed that Bradley Ashworth completed that section of the form. (Trial Tr. Vol. 1 248:19–21; 255:8–9.) Surely the jury could safely infer, then, that Ashworth was an employee of Doomsday Tactical and had its authority to conduct firearms sales. It is unlikely that a non-employee would be permitted to sell firearms for Doomsday Tactical, or that an employee without that authority was permitted to conduct this firearms sale. Moreover, Colton Smallwood, the responsible person on Doomsday's FFL, testified that he was at Doomsday when the sale at issue took place and recalled to sale at issue. (*Id.* 259:2–10.)

proposed defense-theory instruction. Second, Gearheart argues that the verdict form improperly implied that the jury could not acquit him unless it found him not guilty beyond a reasonable doubt. In addition, Gearheart argues that a new trial is warranted because the government exploited the court's pretrial ruling limiting the evidence pertaining to the firearm's recovery to prejudice the jury against him. The court will address each argument in turn.

### 1. Gearheart's Proposed Defense-Theory Instruction

A district court should not reject a proposed jury instruction that "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995). But a district court is afforded some discretion in determining whether to give (or withhold) a proposed instruction, given its primary role in regulating and evaluating the evidence presented at trial and fashioning jury instructions that are supported by that evidence. *See United States v. Sloley*, 19 F.3d 149, 153 (4th Cir. 1994). Moreover, jury instructions must be "viewed and evaluated as a whole rather than in isolation to determine if they are correct." *United States v. Belcher*, No. 4:19-cr-25, 2023 WL 1423754, at *7 (W.D. Va. Jan. 30, 2023).

Gearheart contends that the court erred in sustaining the government's objection to his proposed defense-theory instruction, which he claims was a correct statement of the law and not superfluous. Gearheart's proposed instruction provided:

> **Defense theory of the case**
>
> The defendant has argued that he is not guilty because the government has not proven that he had any knowledge of

- 13 -

whether a false statement was made by Ms. Sherry or that he encouraged her to do so. If you do not believe the government has proven beyond a reasonable doubt either

> 1) That Mr. Gearheart had knowledge of a false statement; or
> 2) Encouraged Ms. Sherry to make a false statement

Then you must find Mr. Gearheart not guilty.

(ECF No. 126, at 2.) In objecting to the proposed instruction during the charging conference—and standing on that objection post-trial—the government argued that this proposed instruction is an incorrect statement of the law because it mischaracterizes the *mens rea* required to aid and abet the illegal straw purchase of a firearm.

On this score, the government is correct; Gearheart's proposed instruction mischaracterized, in a subtle but material way, the *mens rea* required to aid and abet a straw purchase. But the jury instructions ultimately given by the court accurately explained this knowledge requirement:

### INSTRUCTION NO. 22
### Aiding and Abetting (18 U.S.C. § 2)

> In Count One, the defendant is charged as aiding and abetting the making of a false statement in connection with the acquisition of a firearm. Under Title 18, United States Code, Section 2, someone who aids, abets, counsels, commands, induces, or procures the commission of a criminal offense is responsible for that offense as if he committed it himself. The "principal," or the person who committed the offense directly, does not need to be convicted before an accomplice can be convicted. For you to find the defendant guilty, the government must prove each of the following beyond a reasonable doubt:
>
> • First, that the crime charged was in fact, committed by someone other than the defendant;
> • Second, that the defendant did some affirmative act in furtherance of the underlying offense; and

- 14 -

• Third, that the defendant did so with the intent of facilitating the offense's commission.

To show that the defendant acted with the intent of facilitating the offense, it is not necessary for the government to prove that the defendant knew every step that the principal would take. Rather, the defendant acted with the intent of facilitating the offense's commission if he actively participated in the criminal scheme knowing its extent and character.

### INSTRUCTION NO. 23
### Aiding and Abetting for 18 U.S.C. § 922(a)(6)

In order to prove that the defendant aided and abetted a violation of 18 U.S.C. § 922(a)(6), it is enough for the government to prove that the defendant encouraged the straw purchaser to misrepresent herself as the actual buyer of the firearm and that, in order to do so, she was required to lie on a Form 4473. It is not necessary that the government prove that the defendant expressly knew that the straw purchaser must falsely state specific portions of a Form 4473.

Further, the intent necessary to support a conviction can be proven by direct or circumstantial evidence.

(Jury Instrs. Nos. 22, 23 [ECF No. 131].)

As explained at length at the charging conference and, later, during oral argument on Gearheart's Rule 29 motion, Instructions 22 and 23—which explain the government's burden of proving the requisite state of mind of a straw-purchaser accomplice—accurately track the well-established case law on this issue. Specifically, Instruction Number 22 is derived from the Supreme Court's decision in *Rosemond v. United States*, 572 U.S. 65 (2014). In that case, Justice Kagan, writing for the Court and analyzing its longstanding aiding-and-abetting precedent, reiterated that the intent requirement is "satisfied when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense." *Id.* at 77. Stated differently, "[f]or purposes of aiding and abetting law, a person who actively

participates in a criminal scheme knowing its extent and character intends that scheme's commission." *Id.*

Instruction Number 23, which the court crafted to provide specific guidance on how to apply this knowledge requirement to an alleged violation of 18 U.S.C. § 922(a)(6), mirrors the uniform published authority on the knowledge element for aiding and abetting a straw purchase. *See, e.g.*, *United States v. Fields*, 977 F.3d 358, 364 (5th Cir. 2020) ("[T]o effect a straw purchase, it is unnecessary that a defendant expressly know that a straw purchaser must falsify specific portions of a Form 4473."); *United States v. Shorty*, 741 F.3d 961, 970 (9th Cir. 2013) ("The lack of evidence that [the accomplice] knew that [the principal] would have to falsely claim to be the 'actual buyer' of the guns on a form 4473 or that [the accomplice] instructed her to do so is not fatal to the government's case; it is enough that he encouraged her to represent herself as the 'actual buyer' and that, in order to do so, she was required to lie on the forms."); *United States v. Soto*, 539 F.3d 191, 195 (3d Cir. 2008) ("Soto does not cite to any case which holds that to be convicted of aiding and abetting [a straw purchase], the government must offer proof that the defendant expressly knew that the 'straw purchaser' was falsely certifying to a specific question on the 4473 form, and that he specifically instructed his 'straw purchaser' to lie to that particular question.")

As the government pointed out during the charging conference, Gearheart's proposed instruction, which Gearheart conceded was not supported by any authority, implies that to convict Gearheart of aiding and abetting a straw purchase, the government had to prove that he had specific knowledge that Ms. Sherry would make a false statement on the Form 4473—specifically, that he knew she would check "yes" to Question 21-A on Form 4473, falsely

attesting that she was the actual purchaser of the firearm. Insofar as the proposed instruction suggested that proof of Gearheart's knowledge of this specific detail was required to convict, it is an inaccurate statement of the law.

As Instructions 22 and 23 explained (and consistent with *Rosemond* and the federal courts of appeals that have squarely addressed this issue), the government's burden was to prove only the more general proposition that Gearheart knew that Ms. Sherry would do something to misrepresent herself as the actual purchaser during the FFL transaction *and* that he encouraged her to do so. The government, in other words, did not bear the burden of proving that Gearheart knew Ms. Sherry would make a specific false statement on the Form 4473. Accordingly, the court did not err in sustaining the government's objection to Gearheart's proposed instruction, and a new trial is not justified on this basis.

## 2. Verdict Form

Gearheart also contends that an error on the jury verdict form prejudiced him and militates a new trial. Gearheart concedes that he failed to object to the verdict form during the charging conference or at any time before the jury began, or completed, its deliberations. The court must therefore review this claim for plain error.[7] *See* Fed. R. Crim. P. 52(b). As such, Gearheart is only entitled to a new trial on this ground if (1) the error was "plain"; (2) the error affected Gearheart's "substantial rights," meaning that there is a "reasonable probability that, but for the error, the outcome of the proceeding would have been different"; and (3) "the

---

[7] The government contends that plain error is an appellate standard of review, and that Rule 33's "interest of justice" standard governs the court's analysis of this claim. So framed, the government further argues that any infirmity in the verdict form constitutes a technical error or defect that did not affect Gearheart's substantial rights. In the court's mind, this is a distinction without a difference. The purported error on the verdict form, no matter how it is labeled, did not affect Gearheart's substantial rights—specifically, the outcome of the trial.

error had a serious effect on the fairness, integrity or public reputation of judicial proceedings." *United States v. Heyward*, 42 F.4th 460, 465 (4th Cir. 2022) (quoting *Greer v. United States*, 141 S. Ct. 2090, 2096–97 (2021)).

The verdict form approved by the court (and unobjected to by Gearheart or the government) provided:

> We, the jury, unanimously find beyond a reasonable doubt as follows:
>
> As to the charge of aiding and abetting the making of a false statement in connection with the acquisition of a firearm, in violation of 18 U.S.C. §§ 2 and 922(a)(6), on or about November 23, 2020 in the Western District of Virginia, we find Andrew Bradley Gearheart:
>
> ___ NOT GUILTY
>
> ___ GUILTY

(ECF No. 133.) Gearheart argues that the inclusion of the phrase "beyond a reasonable doubt" in the first sentence "incorrectly equates the jury's burden when finding the defendant guilty or not guilty. In effect it requires the jury to unanimously conclude, beyond a reasonable doubt, that the defendant is not guilty before they can acquit him." (Def's Mot. at 15 [ECF No. 160].) Gearheart's concerns are valid insofar as the verdict form does lend itself to this interpretation, which is indisputably an incorrect statement of the law. The government alone bears the burden of proof, and if it falls short of this constitutional obligation, the jury must acquit the defendant. Thus, the language of the verdict form constitutes a clear and obvious error, satisfying the first prong of the analysis.

But this error on the verdict form does not require a new trial because Gearheart has not shown (and cannot show) that it affected his substantial rights—*i.e.*, that it affected the

outcome of the trial. In making this determination, the court examines, as it must, the jury instructions as a whole. *Perry*, 335 F.3d at 323. After doing so, the court is satisfied that the jury was not confused about the fundamental principles (1) that the government bore the exclusive burden to prove Gearheart's guilt beyond a reasonable doubt; (2) that if the government failed in its burden of proof, the jury was obligated to acquit Gearheart; and (3) that Gearheart had no burden to prove his innocence of the crime charged. Throughout the trial, the court repeatedly instructed the jury on these core tenets. During jury selection, the court informed the entire venire:

> Mr. Gearheart denies this charge, has pleaded not guilty and is presumed innocent. The indictment, or the charge against Mr. Gearheart is only an accusation and nothing more. Neither the indictment or the charge itself is proof of his guilt or anything else. And the government bears the burden of proving its case against Mr. Gearheart beyond a reasonable doubt.

(Trial Tr. Vol. 1, at 35:15–21.) And throughout jury selection, the court repeated this admonition numerous times in follow-up questions with prospective jurors. Once the jury was impaneled and sworn, the court instructed, as part of its preliminary instructions:

> In particular, as I have already mentioned, the defendant has been charged with making a false statement in connection with the purchase of a firearm. The defendant has pleaded not guilty to that charge. He is presumed innocent and may not be found guilty unless all of you unanimously find that the government has proven Mr. Gearheart's guilt beyond a reasonable doubt.
> . . .
> Second, the burden of proof is on the government throughout the case. The defendant has no burden to prove his innocence or to present any evidence or to testify. Since the defendant has the right to remain silent, the law prohibits you from arriving at your verdict based on the consideration that the defendant may not have testified.

> Third, the government must prove the defendant's guilt beyond a reasonable doubt. In this respect[,] a criminal case is different from a civil case.

(*Id.* at 120:21–121:2, 124:8–16.) During the trial, after Gearheart rested without putting on any evidence, the court again admonished the jury:

> All right. The defense rests. Ladies and gentlemen, as I told you throughout this trial, Mr. Gearheart has absolutely no burden whatsoever to put on any evidence to testify, and if he elects not to do so, which he has done in this case, none of those choices can be used against him, and so we honor and respect that decision, which means we have concluded the evidentiary portion of this trial.

(Trial Tr. Vol. 2, 88:7–14.) Finally, during its final charge to the jury, the court reiterated the correct standard repeatedly:

> The presumption of innocence also means that the defendant has no burden or obligation to present any evidence at all or to prove that he is not guilty. As I said throughout the trial, the government has the burden of proving the defendant's guilt beyond a reasonable doubt.
>
> . . .
>
> The burden is on the government to prove the defendant guilty beyond a reasonable doubt. This burden of proof never shifts throughout the trial. The law does not require the defendant to prove his innocence or to produce any evidence. If you find the government has proven beyond a reasonable doubt every element of the offense with which the defendant is charged, it is your duty to find him guilty. On the other hand, if you find the government has failed to prove any single element of the offense beyond a reasonable doubt, you must find the defendant not guilty.
>
> . . .
>
> There are three elements of that offense. Before the defendant may be convicted as an aider [and] abet[o]r, the government must prove that the three elements of this offense were committed beyond a reasonable doubt.
>
> . . .

- 20 -

> For you to find the defendant guilty, the [government] must
> prove each of the following [elements] beyond a reasonable
> doubt . . . .

(*Id.* at 97:22–98:2; 98:8–17; 108:24–109:2; 110:3–4.)

In sum, throughout the trial, the court clearly, correctly, and repeatedly articulated Gearheart's presumption of innocence and explained that the government's burden of proof beyond a reasonable doubt only applied to a finding of guilty. Moreover, "[a] jury is presumed to follow the instructions of the court." *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 442 (4th Cir. 2004). Based on the instructions detailed above, which the court read to the jury and a copy of which were provided for its deliberations, the court has no trouble concluding that, when the jury marked the "guilty" line on the verdict form, it did so only after finding that the government had met its burden of proving Gearheart's guilt beyond a reasonable doubt.

Finally, other courts who have encountered verdict forms containing nearly identical errors have reached the same conclusion. *See, e.g.*, *United States v. Rodriguez*, 735 F.3d 1, 13 (1st Cir. 2013) ("Having failed to establish prejudice, defendants cannot show that the language in the verdict form constituted plain error sufficient to warrant a new trial."); *United States v. Cardinas Garcia*, 596 F.3d 788, 800 (10th Cir. 2010) ("Indeed, aside from the verdict form, Cardinas points to no other portion of the jury instructions that suggests confusion regarding the burden of proof."); *United States v. Bustos*, 303 F. App'x 656, 663 (10th Cir. 2008) ("As a result, the jury instructions more than sufficiently stated the governing law and provided the jury with an intelligent, meaningful understanding of the applicable issues and standards, making it improbable the jury at either trial applied the wrong standard or burden based on any faulty construction of the disputed jury verdict forms."); *United States v. Nero*, No. 12-cr-

141, 2013 WL 6044362, at *18 (E.D. La. Nov. 14, 2013) ("Considering these instructions and reading the instructions as a whole in conjunction with the erroneous jury verdict form, and considering the evidence as a whole as presented at trial, this suggests that the substantial rights of the Defendants were protected and the outcome of trial, *i.e.*, the jury's verdict, was not adversely affected by the error in the jury verdict form.").

At bottom, Gearheart has not proffered anything, aside from conclusory assertions, that he suffered any prejudice as the result of the error on the verdict form. And contrary to his characterization of the strength of the government's evidence, after a thorough review of the trial record, the court concludes that the evidence of Gearheart's guilt was overwhelming. Gearheart fully confessed to his involvement in the straw-purchase scheme and his confession was substantially corroborated by his accomplice and other evidence, including his text-message admissions. Because Gearheart has failed to establish any prejudice from the error on the verdict form, a new trial is simply not warranted on this basis.

### 3. The Government's References to an "Unrelated Criminal Investigation"

Finally, Gearheart contends that the government improperly referenced the circumstances of the firearm's recovery by local police several months after the straw purchase at issue, in contravention of the court's prior ruling on his motion *in limine*.

Prior to trial, Gearheart moved *in limine* to exclude evidence related to the firearm's recovery by RPD approximately five months after the alleged straw purchase—the recovery which triggered the federal investigation that led to Gearheart's indictment. (*See* ECF No. 58.) RPD Officer Cochran had recovered the 9 mm pistol at issue during his investigation of a

suspected shooting at an apartment complex. It was undisputed that Gearheart was not present at the time of this shooting and had no role in it whatsoever.

The government nevertheless argued that testimony about the firearm's recovery provided critical context for the jury—specifically, putting Gearheart's oral and text-message admissions regarding his possession and disposal of the firearm into proper context; explaining why the ATF had launched a criminal investigation into the firearm's provenance,[8] which ultimately led them to interview the original purchaser and her accomplice, Gearheart; and laying the requisite foundation for the admission of the firearm into evidence. Ultimately, the court granted Gearheart's motion in part, concluding that evidence of an alleged shooting with the firearm at issue, particularly because it did not involve Gearheart, would be unduly prejudicial to him. (*See* ECF No. 92.) The court therefore prohibited the government from putting on any evidence related to (or mentioning) the alleged shooting. But finding that the basic fact of the firearm's recovery was relevant and necessary for myriad reasons (including explaining and providing context for Gearheart's admissions regarding his acquisition, possession, and disposal of the firearm and his motives for doing so; the origins of the federal investigation; and the introduction of the firearm into evidence), the court permitted Officer Cochran to testify briefly about recovering the pistol on a specific date in connection with an

---

[8] The government vehemently argued that it needed to explain, as part of its case in chief, why federal agents suddenly appeared at the home of a presumably law-abiding citizen to question her about the recent purchase of a firearm from a local gun store. Without some context as to why an ATF investigation was launched—*i.e.*, the recovery of a firearm by local police less than five months after it had been purchased from a gun store— "the government's investigation would appear bureaucratic in the extreme. More likely, the government's investigation would seem invasive, overweening, or even tyrannical. The jury might conclude that the ATF was regularly engaged in hunting down paperwork violations for no reason other than to punish the exercise of Second Amendment rights." (ECF No. 77, at 6.) Given the fraught and polarized nature of modern discourse on gun issues, this concern was more than valid.

unrelated investigation without mentioning the alleged shooting. (*See* Trial Tr. Vol. 1, at 139:18–140:1 [ECF No. 153].)

In seeking a new trial, Gearheart does not challenge the court's pretrial ruling on the motion *in limine*, at least not directly.[9] Gearheart contends that, although the government may have abided by the letter of the court's ruling insofar as it did not reference the gun being used in a shooting, it nevertheless violated the spirit of that directive by using references to an unrelated criminal investigation "to take advantage of universal concern about gun crimes and gun control in the United States to persuade the jury to convict an innocent person." (ECF No. 160, at 19.) Stated differently, Gearheart argues that, "[i]nstead of respecting the [c]ourt's ruling, the government abused it, knowing the court had, in part, agreed with defense counsel's concerns." (*Id.* at 24.)

This argument is belied by the record. In eliciting testimony from Officer Cochran about the recovery of the firearm, the government adhered to the limits imposed by the court by having the witness confirm the basic fact that he recovered the gun at issue at a certain

---

[9] But Gearheart now claims that the court's ruling in excluding any evidence or reference to an alleged shooting didn't go far enough. As a threshold matter, the court notes that Gearheart likely conceded this issue by taking the position, during the final pretrial conference, that it had no objection to the streamlined and sanitized version of the gun's recovery as proposed by the court. Specifically, Gearheart's counsel stated: **"The police acquired a firearm on April 1st. . . . That's fine.** *We have no objection to that coming in.*" (Tr. of Final Pretrial Conference at 19:5–7 [ECF No. 163].) Later during that same hearing, defense counsel represented: **"We are willing to stipulate, and I don't think we proposed—we discussed precisely the firearm was recovered during Roanoke City police investigating an unrelated incident. And we can give the date, April of 2021; I don't care. And I think that's perfectly fine."** (*Id.* at 26:5–9.) Regardless, Gearheart now argues that none of the events occurring after the purchase of the firearm at Doomsday Tactical in November 2021 were relevant to the crime on trial. But as noted above and explained in ruling on the motion *in limine* before trial, the fact that the firearm was recovered by local police less than five months after an FFL transaction was necessary "to complete the story of the crime on trial." *United States v. Brizuela,* 962 F.3d 784, 793–94 (4th Cir. 2020) (cleaned up). As appropriately sanitized by the court, the evidence of the gun's recovery provided "information without which the factfinder would have [had] an incomplete or inaccurate view of other evidence of the story of the crime itself." *Id.* at 795.

location on a particular date during an unrelated criminal investigation. At no point during this witness's brief testimony did the government reference any details of that investigation, let alone that it involved an alleged shooting. Nor did the government violate the court's ruling by later asking SA Moody, the case agent, about the effects, as a general matter, of falsified Form 4473s, and eliciting his response that they "hinder other investigations in the future" and circumvent "the background check, which is a legal standard to make sure that the community is safe." (Trial Tr. Vol. 1, at 149:24–150:2.)[10] Both the question and the agent's response were directly relevant to the FFL transaction at issue, and neither referenced, even indirectly, the circumstances of the firearm's recovery several months after the sale. And in accurately quoting Officer Cochran's and SA Moody's testimony, as summarized above, during its closing arguments, the government did not directly (or impliedly) urge the jury to convict Gearheart out of fear of gun violence or to send a message to the community.

Finally, the government's rebuttal closing argument in this regard was not improper, as government counsel was directly responding to Gearheart's repeated attempts throughout the trial to minimize the significance of the alleged crime and, in so doing, imply that the jury should acquit on this basis. By arguing that this case wasn't really "about a gun" and repeatedly referencing Gearheart's young age and the largely irrelevant fact that he could otherwise

---

[10] Gearheart also takes issue with what he perceives as the government's implication that he engaged Ms. Sherry to purchase the firearm for him to circumvent the background check, contending that the government's argument is "frustrating" and amounts to plain error. (Def.'s Reply Mem. pg. 8.) In making this argument, he highlights the admitted gulf in the law that would allow him to possess a gun, receive a gun as a gift, or purchase a gun at a gun show or in a private sale, but not purchase the same gun from an FFL because of his age. Gearheart asks: "What then is the so[-]called seriousness of the conduct here?" (*Id.*) A valid question, to be sure, but one for Congress, not the courts. And if Gearheart believes that his conduct shouldn't be charged, then he should implore the U.S. Attorney's Office to exercise its prosecutorial discretion. But what he can't do is ask this court to enter a judgment of acquittal because he could have obtained the gun through other *legal* means. This court is neither empowered nor inclined to pass judgment on the propriety of criminal laws or the government's charging decisions.

lawfully possess a firearm, Gearheart's counsel opened the door to the counterargument, appropriately tethered to the evidence and testimony presented at trial, as to why straw purchases are serious—*i.e.*, that they impede accurate record-keeping and, in turn, the government's ability to investigate crimes. In sum, Gearheart's argument that the government disregarded or otherwise exploited the court's pretrial ruling on this issue is wholly without merit.

Even if that the court erred in admitting the sanitized version of the firearm's recovery into evidence—and, by extension, implicitly authorizing the government to reference the same in its opening statement and closing arguments—this error does not militate a new trial.[11] Although Gearheart only makes passing reference to it, the court, *at the defendant's request*, specifically instructed the jury as follows:

> You have heard evidence that the firearm in question was recovered in an unrelated criminal investigation. You should not speculate about that investigation or assume anything about it. The fact of the investigation is relevant only insofar as it helps to explain how the government began the investigation in this case. You should not read into the fact that there was an investigation or hold that against the defendant in deciding whether the government has met its burden of proof.

(Jury Instrs. No. 15 [ECF No. 131]; Trial Tr. Vol. 2, at 106:8–16.) As noted above, "save for extraordinary situations," courts "adhere to the crucial assumption that jurors carefully follow instructions." *United States v. Rafiekian*, 991 F.3d 529, 550 (4th Cir. 2021) (cleaned up). Such is

---

[11] As Gearheart effectively withdrew his original objection and repeatedly represented that he had no problem with the court's proposed sanitized instruction about the firearm's recovery, the court undertakes this additional analytical step purely for the sake of argument.

the case here, and Gearheart has not proffered anything to overcome the presumption that the jury followed this limiting instruction. Accordingly, a new trial is not justified on this basis.

### III.

For the reasons explained above, the court will deny Gearheart's Rule 29 motion and his motion for a new trial. The clerk is directed to forward a copy of this Opinion and the accompanying order to all counsel of record.

**ENTERED** this 12th day of September, 2023.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE