IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **Criminal No. 7:23-CR-00013-TTC** |
| ANDREW BRADLEY GEARHEART, | ) | |
| | ) | |
| *Defendant.* | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States, by counsel, respectfully submits this sentencing memorandum in the above-captioned matter.

## I.    BACKGROUND

The defendant, Andrew Bradley Gearheart, procured the straw purchase of a Taurus G2C 9mm pistol. *See* PSR[1] ¶¶ 7–9. Gearheart asked a family friend, L.S., to buy a pistol for him. *Id*. Four months later, Roanoke City police recovered the Taurus from a third party, T.L., who fled from police during their conduct of a shooting investigation. *See id*. ¶ 6.

The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) traced the recovered Taurus pistol. *Id*. Because the "time to crime" was so short, ATF agents suspected a straw purchase. Agents interviewed L.S., the original purchaser, and learned that she had purchased the gun for Bradley Gearheart at his request. *Id*. ¶ 7. Gearheart, who was also interviewed on December 8, 2021, readily admitted the facts underlying the straw purchase. *Id*. ¶ 8. Gearheart told ATF that he had sold the firearm in January 2021, but did not want to say who the buyer

---

[1] The final PSR is found at ECF No. 176. For improved readability, the government cites to the document name instead of the docket entry for this document.

was. *See id*. Gearheart subsequently claimed that the gun had actually been stolen from him, although he refused to name the purported thief. *See id*.

A federal grand jury indicted Gearheart for aiding and abetting a false statement in the acquisition of a firearm, in violation of 18 U.S.C. §§ 922(a)(6) and 2. ECF No. 3. Gearheart pled not guilty and proceeded to trial. A jury of his peers subsequently convicted him on July 14, 2023. ECF No. 133 (jury verdict). The sentencing hearing is set for January 22, 2024. The government anticipates calling the case agent, ATF Special Agent Adam Moody, as a witness.

## II.    ARGUMENT

Bradley Gearheart used another person to commit a straw purchase on his behalf. The Taurus G2C pistol that Gearheart illegally acquired was recovered on the street four months later in connection with a shooting investigation. And while the other straw purchaser readily admitted her role and took responsibility, Gearheart lied to law enforcement instead.

Weighing on one hand Gearheart's offense conduct, conduct under supervision, and escalating criminal behavior, and on the other, his lack of felony criminal history and personal characteristics, the government recommends a low-end Guidelines sentence of 12 months, including six months of home confinement.

### a.  The Presentence Report Properly Calculates the Guidelines

The government agrees with the probation officer's calculation of the advisory Sentencing Guidelines range. Under U.S.S.G. § 2K2.1(a)(6), the base offense level is 12. Gearheart receives no adjustment points, so his total offense level is also 12. With three criminal history points, Gearheart is in Criminal History Category (CHC) II. Those inputs yield an advisory Guidelines sentence of 12–18 months, Zone C.

Gearheart disagrees with this calculation, raising a variety of Guidelines arguments in objections to the PSR. The Court should overrule each of these objections.

### i.    Section 2K2.1 is the applicable offense guideline.

Gearheart's first claim is that the Court should calculate the Guidelines using U.S.S.G. § 2B1.1, not § 2K2.1, because "§ 2K2.1 does not well fit the conduct at issue," i.e., the straw purchase of a firearm. ECF No. 174 at 1. But he appears to recognize that this argument has no legal merit, acknowledging that Appendix A "clearly indicates that a violation of 18 U.S.C. § 922(a)(6) shall use § 2K2.1." *Id*. Contrary to Gearheart's argument that the offense guideline "does not well fit the conduct at issue," § 2K2.1 specifically provides for offense conduct involving straw purchases, including straw purchases charged under 18 U.S.C. § 922(a)(6). *See, e.g.*, §§ 2K2.1(a)(4)(B), (a)(6)(C). This objection should be overruled.

### ii.    There is no evidence that Gearheart's straw purchase was solely motivated by a "lawful sporting purpose" or "collection."

Gearheart's alternative argument is that if the Court applies § 2K2.1, it should decrease the offense level from 12 to 6 pursuant to U.S.S.G. § 2K2.1(b)(2). ECF No. 174 at 1. This provision applies when firearms involved in the offense conduct were "possessed . . . solely for lawful sporting purposes or collection," and were not "unlawfully discharge[d] or otherwise use[d]" by the defendant. U.S.S.G. § 2K2.1(b)(2). To be eligible, the "exclusive" purpose of the firearms must have been for "sporting purposes or collection"—other lawful uses, such as self-defense, do not qualify. *See United States v. Solomon*, 274 F.3d 825, 828 (4th Cir. 2001); *United States v. Nichols*, 359 F. App'x 433, 434 (4th Cir. 2010). The defendant bears the burden of proving his entitlement to this reduction by a preponderance of the evidence. *United States v. Haring*, 280 F. App'x 301, 301 (4th Cir. 2008) (citing *United States v. Abdi*, 342 F.3d 313, 317 (4th Cir. 2003)).

The commentary to § 2K2.1 explains that the applicability of this provision depends on "the surrounding circumstances," including "the number and type of firearms, the amount and type of ammunition, the location and circumstances of possession and actual use, the nature of the defendant's criminal history, and the extent to which possession was restricted by local law." U.S.S.G. § 2K2.1 cmt. 6. Taken together, the applicable factors unanimously point towards denial of the reduction.

*Number and Type of Firearms*. Gearheart's offense involved the possession of a single firearm: a Taurus G2C 9mm pistol. The G2C is a mass-produced, compact, budget semiautomatic handgun. *See* Harry's Holsters, *Taurus G2C Review*, https://harrysholsters.com/taurus-g2c-review/ (last visited Jan. 11, 2024) (commenting on G2C's small size and low price).  It is hardly the sort of firearm to be used by a hunter, competition shooter, or firearms collector. *See United States v. Hause*, 26 F. App'x 153, 154 (4th Cir. 2001) (affirming denial of reduction in part because the gun possessed was an "inexpensive handgun" and "not the sort of firearm that would be considered a collectible."); *United States v. Andrews*, No. 94-5109, 1994 WL 717589, at *3 (4th Cir. Dec. 29, 1994) (noting that "common shotguns and rifles [are] typically not 'collected' in the narrow sense of being 'collectors' items.'").

*Amount and Type of Ammunition.* This factor is not clearly applicable. Although Roanoke police recovered the Taurus G2C with a loaded, extended magazine, there is no evidence to suggest that it was Gearheart who acquired those items.

*Location and Circumstances of Possession.* Gearheart's possession of the firearm took place under circumstances not indicative of sporting use or collection. At trial, L.S. testified that Gearheart wanted the gun for protection. This fact, standing alone, is likely enough to deny the

reduction. *See Solomon*, 274 F.3d at 828 (noting that the reduction does not apply to "[o]ther lawful reasons" to possess a firearm).

L.S. also testified that after purchasing the Taurus at Gearheart's direction, she dropped Gearheart off at his mother's apartment, where he still resides. ATF agents have visited that location three times: for a December 2021 interview, for Gearheart's arrest on March 21, 2023, and for another interview in April 2023.[2] At no point in the three visits to the apartment did agents see any indications of hunting or competitive shooting. During Gearheart's arrest, agents did, however, find an empty box of Federal 9mm ammunition, two backstraps belonging to a Glock pistol, and what appeared to be a 12-round Taurus magazine in Gearheart's bedroom.



*Items Found in Gearheart's Room*

Gearheart's statements to ATF agents and to L.S. are similarly inconsistent with sporting use or firearms collecting. Gearheart told agents (and later, via text message, L.S.) that he sold

---

[2] This post-indictment interview concerned a separate investigation of federal witness tampering. L.S.'s property was vandalized shortly after Gearheart made his initial appearance in court. ATF agents interviewed Gearheart and his mother about the vandalism. No charges resulted from this investigation.

the Taurus in January 2021.[3] PSR ¶ 8. This fact, if true, further undermines Gearheart's claim that the firearm was possessed for sporting use or collection. *See United States v. Fredman*, 61 F. App'x 82, 84 (4th Cir. 2003) (finding that a defendant's pawning of firearms made him ineligible for the reduction); *Solomon*, 274 F.3d at 828–29.

*Nature of the Defendant's Criminal History.* The defendant's criminal history does not indicate that his possession of the Taurus was "solely for lawful sporting purposes or collection." On the contrary, Gearheart has a significant criminal history that includes juvenile convictions for petit larceny (theft of an iPhone), grand larceny (theft of a dirt bike), unauthorized use (theft of a car), and obstruction of justice. *See* PSR ¶¶ 28–30, 32. During the conduct that gave rise to the obstruction conviction—which occurred just three months after Gearheart's straw purchase— Gearheart was reportedly among three men attempting to "jump" another individual. *See id.* ¶¶ 6, 32. Police patted down one of Gearheart's companions and found him to have a .45 caliber Glock pistol on his person. *Id.* ¶ 32.

*Extent to Which Possession Was Restricted by Local Law.* Finally, Gearheart's possession was restricted by law. As Gearheart admitted to the United States Probation Office, he is a daily marijuana user who began using marijuana at age 16. *See* PSR ¶¶ 3, ("Gearheart admitted he uses marijuana every day . . . ."); 5 (diagnosed with cannabis use disorder), 39 (arrested at age 17 for possessing marijuana), 52 (started using marijuana at 16). Accordingly, his possession of firearms violates 18 U.S.C. § 922(g)(3).[4] *See United States v. Sandreth*, 595 F.

---

[3] In the same conversation, Gearheart claimed that the gun was stolen.

[4] In *United States v. Clay*, 627 F.3d 959 (4th Cir. 2010), the Fourth Circuit indicated that defendants are not "automatically ineligible for the lawful sporting purposes reduction" because they are not eligible to possess a firearm. *Id.* at 970–71.

App'x 244, 245 (4th Cir. 2015) ("Sandreth 'unlawfully possessed' the heirloom rifle when he did so as a drug user . . . .").

Taken together, these factors indicate that Gearheart cannot meet his burden of showing that the "exclusive" purpose of possessing the Taurus G2C was for "sporting purposes or collection." *Solomon*, 274 F.3d at 828; *Nichols*, 359 F. App'x at 434. The Court should deny him the benefit of a six-level reduction in offense level.

### iii.    Gearheart was not a "minimal participant"; on the contrary, he orchestrated the offense.

The defense argues that Gearheart should receive a mitigating role reduction because he was a "minimal participant" in the criminal activity, arguing that "he never asked or knew that the straw would commit a crime . . . to acquire a firearm." ECF No. 174 at 1. Under U.S.S.G. § 3B1.2, a defendant may receive a two-to-four-point reduction if they were a "minor participant" in the criminal activity, a "minimal participant," or somewhere in between.

By its plain terms, this provision does not apply. Gearheart was not a "minimal participant": he was the moving force for the entire offense. The straw purchase was Gearheart's idea. The firearm was for Gearheart. And to accomplish his objective, Gearheart used another person as an instrument to buy a firearm on his behalf, knowing that he could not lawfully purchase the gun from the gun store himself. *See also* PSR at 29 (probation officer's response that "Gearheart . . . stood to benefit the most from the criminal activity because he was the one that ultimately obtained a firearm.").

---

To the extent that *Sandreth* is at tension with *Clay*, *Clay*, a published decision, controls. Accordingly, the government's argument is not that Gearheart is *per se* ineligible for the reduction. Nevertheless, the fact that his possession was restricted by law is a relevant factor for the Court to consider in determining the applicability of the reduction. *See* U.S.S.G. § 2K2.1 cmt. 6.

Gearheart professes that he never encouraged anyone to break the law for him or knew that they would break the law for him. But it is hornbook law that ignorance of the law is no defense. *See Cheek v. United States*, 498 U.S. 192, 199 (1991) ("The general rule that ignorance of the law . . . is no defense to criminal prosecution is deeply rooted in the American legal system."). And although Gearheart claims that he didn't know what he did was illegal, a jury of peers found that he possessed the requisite *mens rea* under 18 U.S.C. §§ 922(a)(6) and 2. *See* ECF No. 131 at 28 ("The defendant [acted] with the intent of facilitating the offense's commission.").

At root, Gearheart is challenging *the magnitude of his offense*. That is not what U.S.S.G. § 3B1.2 is for: it is concerned with the role of the defendant, not the seriousness of the offense.[5] *See* U.S.S.G. Chapter 3 Part B ("This part provides adjustments to the offense level based upon the role played in committing the offense."). The Court should deny any mitigating role reduction.

### iv.  Gearheart didn't accept responsibility, so he isn't entitled to a two-point reduction in offense level.

Finally, Gearheart claims that he is entitled to a two-point reduction for acceptance of responsibility. A defendant who "clearly demonstrates acceptance of responsibility for his offense" may receive a two-level reduction in offense level.[6] *See* U.S.S.G. § 3E1.1. "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt . . . ." *Id*. cmt. 2.

---

[5] The seriousness of the offense is captured by the relevant offense level from U.S.S.G. § 2K2.1.

[6] A third point for acceptance can be available upon the motion of the government, pursuant to § 3E1.1(b). That third point is not at issue here, because the total offense level is less than 16.

Gearheart argues that he never denied any of his conduct, "he simply argued that his conduct was not criminal," which is "different than denying an essential element of the offense." ECF No. 174 at 1. That is not an accurate characterization of Gearheart's defense at trial. Gearheart advanced an alternative theory that L.S. had lawfully gifted or sold him a firearm. That theory was an attack on the essential elements of L.S.'s violation of 18 U.S.C. § 922(a)(6), which the government was required to prove in order to establish Gearheart's liability as an accomplice. *See* ECF No. 131 at 26 ("Before the defendant may be convicted as an aider and abettor, the government must prove . . . [L.S.] knowingly made a false or fictitious oral or written statement intended or likely to deceive the firearms dealer."). Additionally, Gearheart challenged the proof as to his mental state, an essential element of the offense.

This is, in short, not the "rare situation" in which a defendant goes to trial while admitting factual guilt. *See* U.S.S.G. § 3E1.1 cmt. 2. The Court should deny Gearheart's objection on this point.

### b.   The Section 3553(a) Factors Are Mixed

Because the PSR properly calculated the Guidelines, the question before the Court is what sentence to impose, pursuant to the factors outlined in 18 U.S.C. § 3553(a). Those factors are mixed.

***Nature and Circumstance of the Offense.*** Bradley Gearheart orchestrated the illegal straw purchase of a firearm. The defense will likely downplay the significance of that crime, portraying it as a victimless paperwork violation. That is typical of these types of crimes, where the penalties are often, as here, not high. But straw purchases have serious consequences: by putting illegal guns onto the streets, they fuel a cycle of violent crime. In this very case, the gun

that Bradley Gearheart illegally acquired ended up recovered from T.L. in the course of a shooting investigation just four months later.[7] *See* PSR ¶ 6.

To be sure, the exact quantum of Gearheart's responsibility for that incident is unclear. At the time of his interview by ATF, Gearheart told agents (and later L.S.) that he sold the gun in January 2021, although it is unclear whether Gearheart sold the gun to T.L. Gearheart also claimed in the same interview, and later in a jail call, that the gun had been stolen. Whatever the exact path that the gun took from Gearheart to T.L., Gearheart bore some responsibility for putting an illegal gun into the wrong hands.

***History and Characteristics of the Defendant.*** Gearheart's history and characteristics are mixed. On the one hand, Gearheart has no prior felony criminal history as an adult. He appears to have endured a difficult family life, living with an alcoholic family member who subjected him to emotional and physical abuse. *See* PSR ¶¶ 42–43, 46. Gearheart feels responsible for the care of his 12-year-old brother. *See id.* ¶ 43. And as noted earlier, Gearheart may have substance

---

[7] As the Court recognized, it is not manifestly clear exactly what happened in that incident. A copy of the police report is on the docket at ECF No. 84.

In April 2021, Roanoke City police responded to a 911 call that reported a gunshot wound. Responding officers found a panicked woman in the back seat of a car. She claimed that she had been walking with T.L., the father of her child, when someone shot at them from a vehicle. A witness told a different story. The witness reported that he heard a gunshot and went outside to find a woman on the ground and a man standing near her. The man had a black handgun with an extended magazine, and stated: "Help me, help me, I just shot my girlfriend." The witness picked up the woman and took her to his friend's car.

Police later encountered T.L., who matched the description given by the witness. When police told him to stop, T.L. began running, and a black handgun with an extended magazine fell to the ground from under his hoodie. After a brief foot pursuit, officers arrested T.L. In a search incident to arrest, officers found a small quantity of marijuana on T.L.'s person.

abuse issues: He reported daily use of marijuana and was diagnosed with cannabinoid use disorder, for which he received some treatment.[8] *See id*. ¶¶ 3, 50, 52.

On the other hand, Gearheart's history also includes a number of aggravating factors. Gearheart's criminal history, while not especially egregious, is significant. As discussed earlier, Gearheart has juvenile criminal convictions for petit larceny (2017), grand larceny (2017), and unauthorized use of a vehicle (2018). *Id*. ¶¶ 28–30. He also had adult convictions for reckless driving (2019) and obstructing justice (2021). *Id*. ¶¶ 31–32. And Gearheart has had a number of arrests for serious conduct, including malicious wounding by mob (2020) and assault and battery (2023). *Id*. ¶¶ 40–41.

Viewed together, these incidents paint a picture of an individual who is headed in the wrong direction. Gearheart graduated from stealing phones, to stealing dirt bikes, to stealing cars. *See id*. ¶¶ 28–30. More troublingly, his more recent charges and arrests involve violent incidents. *See id*. ¶¶ 31–32, 40–41. As noted above, Gearheart's 2021 obstruction conviction stemmed from a fight. *See id*. ¶ 32. An individual reported that three members of the "Heights gang" (including Gearheart) were attempting to "jump" his friend. *Id*. Police ultimately patted down one of Gearheart's companions and found a .45 caliber Glock pistol on his person, along with nearly $7,000 in cash. *Id*.

That picture is reinforced by Gearheart's conduct under supervision. Gearheart was released on bond on March 23, 2023. *Id*. ¶ 3. Approximately one month later, probation officers went to Gearheart's house for a home visit. *Id*. Officers noticed what appeared to be marijuana

---

[8] Gearheart's participation in treatment has been largely unsuccessful, although it appears that this may be through no fault of his own. *See* PSR ¶ 5.

and ordered Gearheart to provide a urine sample. *Id*. Gearheart then attempted to cheat the urinalysis by providing a sample of toilet water. *Id*.

A male probation officer arrived at Gearheart's apartment to perform a second, observed urinalysis. *Id*. Gearheart became combative and disrespectful to the officer. *See id*. Gearheart ultimately provided a urine sample which was positive for marijuana. *Id*. Despite his positive test, he denied using marijuana and claimed the positive result was from secondhand exposure. *See id*. Ultimately, however, Gearheart admitted that he used marijuana every day. *Id*. Judge Ballou subsequently found that Gearheart violated his bond conditions but kept him on bond.[9] *Id*. ¶ 4.

Turning to Gearheart's other history and characteristics, Gearheart quit high school in the tenth grade. *Id*. ¶ 54. He does not appear to have trade or professional skills, and his employment history has been sporadic at best. *See id*. ¶¶ 54–55.

### c.  A Downward Departure or Variance Would Not Be Appropriate Under the Facts of This Case

Gearheart argues that the Court should vary downwards, in light of his "minimal[ly] culpable conduct." ECF No. 174 at 1–2. In addition, the PSR suggested that Gearheart's childhood and home life, along with his history of cannabis use disorder, might serve as a grounds for a downward variance. PSR ¶ 75. For reasons discussed earlier, Gearheart's conduct was not "minimally culpable." And a downward departure or variance based on Gearheart's personal characteristics would not be appropriate, given Gearheart's conduct under supervision, and given his escalating pattern of criminal behaviors in recent years.

---

[9] Gearheart also admitted using marijuana again on June 22, 2023. Probation did not seek to revoke his bond. PSR ¶ 5.

To be sure, the Court should consider Gearheart's family life and upbringing, along with his lack of felony criminal history, as mitigating factors. But the § 3535(a) factors, taken together, support a low-end sentence, rather than a below-Guidelines sentence. The government accordingly recommends a sentence of 12 months. Because the advisory range is in Zone C, the Guidelines provide for up to one-half of the sentence in community confinement or home detention. The United States recommends that the Court impose home detention for the maximum allowable period, so that Gearheart serves six months in prison, and six months at home. Finally, the government recommends a low-end Guidelines period of supervised release of one year. *See* PSR ¶ 62.

### III.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court adopt the PSR as written. The government asks that the Court impose a term of imprisonment of 12 months (including six months on home detention), to be followed by a period of supervised release of one year. Such a sentence will be sufficient, but not greater than necessary, to accomplish the sentencing objectives set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

CHRISTOPHER R. KAVANAUGH
United States Attorney

/s/ Lee S. Brett
N.C. Bar No. 57838
Assistant United States Attorney
United States Attorney's Office
P.O. Box 1709
Roanoke, VA 24008-1709
Tel: (540) 857-2250 | Fax: (540) 857-2614
lee.brett@usdoj.gov

13

## CERTIFICATE OF SERVICE

I hereby certify that on 1/12/2024, I caused to be electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Lee S. Brett
Assistant United States Attorney