IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

United States of America

      v.                                          Docket No. 7:23-CR-13-TTC

Andrew Bradley Gearheart

### Defendant's Sentencing Memorandum

A sentence of time served is sufficient, but not greater than necessary, to accomplish the goals of punishment. The government, by its inaction and delay in prosecuting this case, and its decision to offer a misdemeanor to the more culpable party, has shown that incarceration is not necessary. Prison would seriously hinder Bradley's ability to maintain his distance from negative influences that could mire him in the criminal legal system. The lifelong consequences of a felony conviction impose serious retributive harms that provide more than sufficient punishment for a youthful act that was not plainly illegal—at least to him—at the time of the offense. And prison will likely contribute to further harm to society and could increase the risk of recidivism. Although the guidelines call for a minimal term of imprisonment, this case is outside the heartland, and the court should vary below the advisory guidelines to impose a sentence of time served. Additionally, there is no minimum term of probation or supervised release, and Bradley's time spent on bond demonstrates that further supervision is unnecessary.

I.      **The conduct at issue is outside the heartland of straw purchases cases.**

Several aspects of this case differentiate it from most other straw purchase cases. Those aspects all call for a sentence lower than the advisory guideline range. *See Koon v. United States*, 518 U.S. 81, 109 (1996) (requiring courts to consider whether circumstances of a particular case "take[ ] the case outside the heartland of the applicable Guideline").

A. **The goals of straw purchase legislation are not advanced by this prosecution.**

The primary purpose behind criminalizing straw purchases is to prevent guns from getting into the hands of people who are not legally able to acquire them. *See Abramski v. United States*, 573 U.S. 169, 180 (2014) ("[f]ederal law has for over 40 years regulated sales by licensed firearms dealers, principally to prevent guns from falling into the wrong hands"). That purpose is clearly not furthered here, where Mr. Gearheart was perfectly able to acquire and to possess a firearm. That fact alone distinguishes this case from the majority of straw purchases, where a straw acquires a firearm for a person prohibited from possessing one. Thus, the "principal" purpose of the law has almost no relation to the facts of this case. A related, secondary purpose of the law is to assist law enforcement "in investigating serious crimes." *See id.* Though the firearm at issue here may have been discharged in the city, that is classified by Virginia as a misdemeanor. *See* Va. Code §18.2-280 (A). While any discharge of a firearm has the potential to become serious, that potential does not elevate the severity of the conduct. And the person the government believes may have

discharged the firearm had his case nolle prossed by the commonwealth. There is no credible argument that Mr. Gearheart's conduct in any way interfered with the government's ability to investigate serious crimes. As such, neither the primary nor secondary purposes of the straw purchase legislation have been furthered by the government's prosecution. The facts of this case clearly place the conduct at issue outside the heartland of straw purchase offenses.

The Sentencing Guidelines provide for a departure in exactly this scenario. *See* U.S.S.G. §5K2.11:

> In other instances, conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue. For example, where a war veteran possessed a machine gun or grenade as a trophy, or a school teacher possessed controlled substances for display in a drug education program, a reduced sentence might be warranted.

The Eighth Circuit considered a case with strikingly similar application in *United States v. Lewis*. 249 F.3d 793 (8th Cir. 2001). In *Lewis*, the defendant plead to violating 18 U.S.C. 922(g) and 922(a)(6). Essentially, the defendant was a felon and briefly took a family heirloom firearm to the pawnshop to obtain money to pay bills. *See id.* at 794. When he retrieved the firearm a few days later, he falsely filled out the ATF form 4473. *Id.* The district court denied the defendant's motion for a reduction under section 5K2.11, but the record did not indicate why the court denied the motion. The Eighth Circuit reversed and remanded the case and provided clear instructions that the court had the authority to grant such a motion, and that the court needed to consider evidence and arguments in support. *See id.* at 797. But the court appeared to

hint that it believed the purposes of 922(a)(1) and 922(a)(6) would not be advanced "if the district court were persuaded by [the defendant's] proffered motive." *See id.*

Other courts have considered the same issue on similar facts. In *United States v. Hadaway*, the Eleventh Circuit approved of a lesser harms reduction for a defendant who illegally kept a sawed-off shotgun for spare parts. 998 F.2d 917, 919 – 20 (11th Cir. 1993). *See also United States v. White Buffalo*, 10 F.3d 575 (8th Cir. 1993) (involving a defendant who possessed one short bolt-action rifle to hunt animals under crawl spaces). These cases were decided prior to *Abramski*, which identified (or divined) the second purpose of 922(a)(6): investigating serious crimes. But their logic applies with equal force given that Bradley's conduct did not hinder the investigation of serious crimes. The commonwealth did not care about the firearm, it does not appear to have been used in any illegal activity, and the government delayed months to investigate and years to prosecute this case.

### B. Form 4473 is confusing, and Bradley never saw or read the form.

To advance these legislative purposes, the ATF devised a lengthy form that requires people merely to check boxes and sign their names. This scheme is similar to various contracts of adhesion requiring people to check a box to agree to terms of service before using some type of software. Almost nobody peruses those terms before checking the box that the person accepts the terms. The form at issue in this case, the ATF Form 4473, is seven pages and uses small font and tightly packs together

several questions. Rather than explain each question thoroughly, the form refers the purchaser to three pages (with even smaller font) explaining each question. On information and belief, these forms are now completed electronically, often using an iPad—further cementing the comparison to terms-of-service contracts.

Why does this matter? Because the portion of the form at issue (Question 21 a) in this case does not easily convey the required information. Pages 4 and 5 better explain it, but also confuse the issue by introducing the concept of a gift and how certain gifts are permitted, but others are not. The form could simply ask, "are you purchasing this firearm for yourself?" Or, "has any person asked you to purchase this firearm for her or him?" Though L.S. probably knew that she was doing something wrong when she purchased the firearm, its not clear that reading the form in any way helped her come to that understanding. In fact, it's not entirely clear that she gave the form any thought.

Also mitigating, Mr. Gearheart never saw or read the form. He is not the person who provided false information to an FFL. He merely asked someone to purchase a firearm, and that person never told him that she intended to break the law to help him to get a gun. And the purchaser could have completely lawfully performed this transaction. She could have either bought the firearm intending to later sell it to him, or she could have purchased it as a gift. The end result of either of these slight changes to her mental state at the time she acquired the firearm would have made the conduct here completely lawful. And the result would have still been the same. In many respects, distinguishing between culpable and innocent mental

states is akin to counting how many angels can dance on pinheads. And yet, now Bradley stands convicted of a felony based on minute distinctions in another person's thoughts that were never communicated to him and were not the result of his intentional conduct. Though ignorance of the law is not a defense to charges, one's ignorance of his criminal conduct significantly mitigates at sentencing.

## C. Bradley's relationship to the straw is mitigating because she was a parent-figure to him.

Many straw purchases are carried out by unwitting people who are pressured to buy guns for others—often those who hold a position of influence or power over the straw. The 2023 guidelines incorporate these circumstances into reductions for straws. *See* U.S.S.C. 2K2.1(b)(9). In these cases, the more culpable party is the person who solicits the straw to make the purchase. In this case, Bradley sought help from a parent-figure to acquire a firearm—a constitutional right that was then available to him. And he sought help from someone who had knowledge of firearms, who possessed firearms, who openly advocated for people to possess firearms, and who had purchased firearms before. Bradley was not trying to induce a hapless victim into committing a crime. He sought advice from a mentor, and the mentor is the person who chose to help Bradley by committing a crime when she easily could have used a legal method to help Bradley.

## D. New straw purchase legislation would not have criminalized this conduct.

Congress recently added new legislation specifically criminalizing straw purchases. *See* 18 U.S.C. § 932. But Bradley's conduct (and the straw's conduct) would

not have violated the statute. Section 932 specifically criminalizes straw purchases when the recipient is either a prohibited person, a person who intends to use the firearm in the course of any felony, or a person intending to transfer the firearm to such a person. *See id.* Bradley and the straw would not have violated this law, even were it in effect when the incident occurred. Because Bradley was not prohibited from possessing a firearm, none of his actions or the straw's actions would have violated this new law.

Clearly, even when proposing new laws to specifically proscribe straw purchases, Congress did not see fit to criminalize this activity. This is, perhaps, because people buy guns for others all the time. People buy guns as gifts, including for children. Often the gift would not be considered "bona fide" by the ATF's definition, as gifts to children are often to reward positive behavior. And the ATF definition requires that the gift not be provided after receiving anything of value.

The court could infer from Congress's recent addition of the straw purchase law that Congress does not see the activity in this case as a straw purchase. Instead, Congress views this simply as providing false information to a federal firearms dealer. And that crime—simple dishonesty—warrants less punishment and is less culpable.

## II.    Bradley's history and characteristics warrant a sentence of time served.

Until recently, Bradley lived in public housing with his mother and younger brother. His brother was recently removed from the home, and he now lives with his

aunt in Rocky Mount. Bradley did not meet his father until he was thirteen years old. And then he met him for a few weekends, and his father decided that he did not want to be a part of Bradley's life. Bradley was rejected twice by his father: once before he even knew that it happened, and once at an age when many young boys yearn for their father's love. Doubtless this rejection contributes to Bradley's manageable, but consistent, depression. Doubtless the absence of a father figure in his life has contributed to his apparent state of seeming lost. And doubtless it contributed to his juvenile record.

Bradley's mother has also rejected him in a sense. Though they live together and his mother loves him, she has largely failed to rear or parent him. When younger, she would physically and verbally abuse him. The physical abuse has largely stopped, but the verbal and emotional abuse is a constant part of Bradley's life. His mother's abuse often leads the police to come to their home, but Bradley has consistently decided not to press charges or to help the government prosecute his mother. Prosecuting his mother might ultimately provide some benefit, but Bradley knows that the immediate and short-term consequences would be horrific. He and his brother would likely be homeless, and he and his mother's relationship could be forever broken. Bradley also views his mother's actions through a different lens than would an outsider. For instance, even though his mother has tried to get Bradley evicted from their home during drunken tirades (and has called the police to enlist their aid in her schemes), Bradley describes his mother's actions as "drunk pettiness."

He has learned to deal with terrible abuse and has learned to cope with behaviors that otherwise would cause enormous pain.

Counsel recently learned that Mr. Gearheart's mother is facing eviction proceedings. Bradley has family in the area, but none appear to have the ability to provide him a place to live. That may change when Bradley and his mother are finally forced into homelessness, or his mother may be able to find another place to live. Bradley's recent felony conviction will make it more difficult for him to find housing living apart from his mother.

Given his mother's troublesome behaviors in Bradley's youth, leaned heavily on his aunt to parent him. She died, though, in a horrific car accident, and that loss still pains Bradley. The only real parental figure in his life was snatched too quickly from him, and he had nobody to support him through that pain. This coincides with the period in Bradley's life when he engaged in juvenile criminal conduct. But that conduct was entirely juvenile in nature and does not warrant any real consideration in terms of fashioning a sentence.

### III.    Bradley's record is minimal, juvenile, and does not weigh in favor of a sentence of incarceration.

First, although the government terms Bradley's record as "significant," it is not. When Bradley was 16, he plead to stealing an iPhone. He accepted responsibility for that conduct and quickly paid restitution. Around the same time, Bradley was also cited for truancy, but that case was dismissed. Most parents of sixteen-year-old children help to ensure that their kids actually attend school. Bradley's mother did not. Even still, Bradley managed to pay restitution for his crime. Bradley's second

conviction was originally taken under advisement. The PSR does not indicate precisely why the case was later reinstated and why Bradley ultimately received about 45 days of detention for his conduct. Bradley's next conviction was for unauthorized use, but it proceeded opposite of his prior conviction: he was originally detained, but he was quickly released and appeared not to get into trouble for the duration of his case.

Bradley's adult convictions are likewise juvenile in nature: he did not listen to commands from officers to leave the scene of an arrest, but nothing indicates that he actively impeded officers: he received just a $100 fine for that behavior. Similarly, he drove recklessly. But since this case originated (and, frankly, since the conduct for which he was convicted), Bradley has not been convicted of any crimes.

The government vastly overstates the significance of Bradley's minor record because the government fails to consider the "mitigating qualities of youth" that must be taken into consideration at sentencing. *See Johnson v. Texas*, 509 U.S. 350, 367 (1993). Indeed, "[a]n offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants" youthfulness into account at all would be flawed." *See Graham v. Florida*, 560 U.S. 48, 76 (2010). Courts consistently recognize that young people engage in juvenile and delinquent acts because youth "is a time of immaturity, irresponsibility, impetuousness, and recklessness." *See Miller v. Alabama*, 567 U.S. 460, 476 (2012) (cleaned up). Of significant importance, especially for courts when considering how to sentence young people who have committed crimes, is that these "signature qualities are all transient." *See id.* The

decisions that recognize that "juveniles are typically less culpable than adults" center on the delayed development of young peoples' brains which explains their behavior. That same body of scientific literature equally says that period of immaturity does not automatically end at age 18: it continues through early adulthood. *See Commonwealth v. Mattis*, __ N.E.3d __, 2024 WL 118188 (Mass. 2024).

In extending the protections of *Miller*, and *Graham* to young adults under 21, the Massachusetts Supreme Judicial Court found the following:

> [E]merging adults (1) have a lack of impulse control similar to sixteen and seventeen year olds in emotionally arousing situations, (2) are more prone to risk taking in pursuit of rewards than those under eighteen years and those over twenty-one years, (3) are more susceptible to peer influence than individuals over twenty-one years, and (4) have a greater capacity for change than older individuals due to the plasticity of their brains. The driving forces behind these behavioral differences are the anatomical and physiological differences between the brains of emerging and older adults. *See* Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 Developmental Rev. 78, 82-84, 85-89 (2008). These structural and functional differences make emerging adults, like juveniles, "particularly vulnerable to risk-taking that can lead to poor outcomes."
> *Id.* at *5.

Each of these factors not only helps to explain why Bradley's minor record is largely insignificant in fashioning a sentence, they also help to explain why his conduct in this case is not deserving of a period of incarceration. Bradley's conduct in this case occurred when he was 19. He is not much older now, but has demonstrated that he can refrain from criminal activity even when presented with significant challenges.

**IV.  None of the other factors under 18 U.S.C. 3553(a) support imposing a sentence of incarceration.**

At bottom, Mr. Gearheart asked a trusted family friend to help him to acquire a gun—a right given to him and to all by the Constitution. He did not ask the person to violate the law. He never asked her to lie. He did not know that she chose to commit a crime to help him accomplish his goal. Although the government is correct that ignorance of the law is not a defense, it is certainly mitigating. How can a sentence specifically deter a person who did not intend to commit a crime? How does such a sentence generally deter others? Congress specifically chose to proscribe straw purchases, and it chose to leave out the scenario that occurred in this case. Clearly, even when passing the largest gun reform in decades, Congress was unconcerned with the activity that occurred here. How would a sentence of incarceration protect the public from further crimes of the defendant when he has not engaged in any crimes since the conduct at issue here? And how would a short period of incarceration provide Bradley with rehabilitation? He would not likely qualify for any programs, given the short duration of a sentence, nor is there any likelihood that he would complete any programs.

Mr. Gearheart understands that, in asking for time served without a period of supervised release, he is asking the court to step far outside the norm. However, such a sentence is permitted for this offense. *See* 18 U.S.C. § 924(a)(2). And though Bradley struggled at the beginning of his period on bond, he has avoided criminal behavior. He struggles with using marijuana—a substance legal in Virginia and in several other states—but his poverty makes it difficult for him to regularly attend any

treatment. And because he is not otherwise facing adverse consequences because of his decision to use drugs, it is not altogether clear that he has a substance abuse disorder that needs treatment or that could be resolved by available treatment. Many people regularly consume alcohol, but that regular consumption alone does not mean that those people have an alcohol-use disorder. The same logic applies to marijuana—even though it is still proscribed under federal law. Indeed, the President recently decided to pardon people convicted of simple possession of marijuana, and the Justice Department does not bring such prosecutions.

Supervised release or probation would not help fix any of the events that led Bradley to try to purchase a firearm, nor will either help him get out of poverty or resolve his longstanding familial disputes. Instead, supervision is likely to lead him to face additional legal challenges simply by virtue of the fact that he is being supervised. A recent study analyzed the efficacy of supervision for low-level offenders and found that "post-release supervision caused large increases in reimprisonment with no detectable impact on reoffending." *See* Ryan Askoda, *Abolish or Reform? An Analysis of Post-Release Supervision for Low-Level Offenders*, December 19, 2023, *available at* [https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4670939](https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4670939). The report concludes, "[f]or a substantial portion of the population released from prisons, continued supervision in the community is not necessary to maintain public safety." *Id.* at 45 – 46.

Finally, the government's decision to offer a misdemeanor conviction with an assumed promise of no incarceration to the straw in this case demonstrates that,

sometimes, criminal conduct does not warrant imprisonment. Indeed, in *Abramski,* the defendant—a former police officer who was suspected of other criminal activity—received a sentence of probation. *See Abramski*, 573 U.S. at 176. What is strange about this case is that the straw was the person who decided to commit a crime—and Bradley was entirely ignorant of that decision. The government characterized her as being truthful to the police and Bradley as being deceitful. But that ignores the fact that the straw first lied to the police and they had to confront her with her dishonest, and Bradley's only potential deceit was in terms of how the firearm was removed from his possession. Bradley was the ignorant juvenile who simply asked a trusted adult to help him; the straw was the sophisticated adult who decided to commit a crime and lied to federal investigators. And yet, the government chose to prosecute Bradley by seeking a felony and to prosecute the straw by seeking only a misdemeanor.

## Conclusion

Bradley is twenty-two years old. At nineteen, he stupidly decided that he wanted a gun, though he was not mature enough for that responsibility. Even though it was legal for him to possess one, he could not easily purchase one given federal restrictions on sales. The only way that he could obtain a firearm was through a private sale. He asked a trusted person for help, and her actions caused him to be convicted of a felony. Bradley's conduct was minor: it was entirely non-criminal in nature (asking for help to obtain a firearm), though when combined with the actions of another, resulted in his felony conviction. But the purposes behind the law that he violated are not furthered by his prosecution or any sentence. And

though Bradley had a volatile childhood, he has demonstrated that he does not need supervision or imprisonment to remain free of criminal activity. A sentence of time served in this case is sufficient, but not greater than necessary.

Respectfully submitted,

/s/ Benjamin Schiffelbein and Abbigail Thibeault

210 First Street SW, Ste 400
Roanoke, VA 24011
Benjamin_Schiffelbein@fd.org, Abigail_Thibeault@fd.org
540 777 0880