**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE No.: 7:25-cr-00009 |
| | ) | 7:23-cr-00013 |
| ANDREW BRADLEY GEARHEART | ) | |
| | ) | |
| Defendant | ) | |

**MR. GEARHEART'S SENTENCING MEMORANDUM**

Mr. Gearheart respectfully requests this Court sentence him to 18 months for possessing a firearm in violation of 18 U.S.C. 18 U.S.C. § 922(g) and 6 months for his supervised release violations, for a total of 24 months incarceration. This slight, 12-month downward variance is sufficient but not greater than necessary pursuant to 18 U.S.C. § 3553.

I. **_Felon-In-Possession, Particularly Considering Mr. Gearheart's Underlying Felony is Relatively Minor Misconduct Comparative to Other Offenses_**

Any federal crime is serious and the scourge of illegal guns in today's society is a serious one. However, if all federal crimes were created equally then the seriousness of the offense would not be a factor to consider under 18 U.S.C. § 3553 because all crimes would be considered serious. Felon in possession is a crime because it is the government's effort to keep weapons out of dangerous hands. Mr.

Gearheart is not violent nor dangerous. His possession of a gun was only illegal because of his previous felony.

The elephant in the room, of course, is that Mr. Gearheart was very recently convicted of a felony before this very Court and he received a "light" sentence of two years supervised release, which he was on while committing this crime. However, the circumstances of his previous felony conviction, described in Defense's memorandum at ECF No. 178, 7:23-CR-13, are unique. Mr. Gearheart's actions for his underlying felony might not otherwise be a crime pursuant to 18 U.S.C. § 932. Indeed, it is a bit counterintuitive that Mr. Gearheart ended up being a felon for the purchase of a firearm while his elder, trusted family member, who actually bought the gun, is not. That makes this very different from a typical felon-in-possession case, which in and of itself is not the most severe crime seen in this Court.

It would also be a mistake to punish Mr. Gearheart, in considering a sentence for the underlying crime, for possessing a firearm while being on supervised release, for these are two different situations with different considerations. Mr. Gearheart's "just punishment" must be punishment for the act itself – possessing the firearm as a felon, not for possessing the firearm while on supervised release. What is just for a troubled young man, with a strange/non-serious/almost non-criminal felony, who possessed a gun, but never used it, threatened to use it, with no violence in his past? Surely the nature of the crime itself, including the underlying felony, warrants less punishment than a typical case of this nature. Thus, a downward variance is warranted.

## II. *Mr. Gearheart Grew Up and Continues to Live In a Difficult Situation*

This Court is well aware of Mr. Gearheart's background as it has been detailed well in both Mr. Gearheart's original sentencing memorandum seen at ECF No. 178, 7:23-CR-13 and in his PSR. Counsel will not belabor the point. Mr. Gearheart grew up in poverty with an unstable mother who often subjected he and his little brother to intense emotional and physical abuse. He and his mother are part of a volatile, codependent relationship. It got so bad that Mr. Gearheart's little brother was taken away from the home. Mr. Gearheart had no adults he could look up to for guidance. Indeed, the one adult he did look up to allowed Mr. Gearheart to catch his first felony.

Unfortunately, the situation got no better in the time since Mr. Gearheart's last sentencing. He and his mother are often at odds, yelling and emotionally attacking each other. But Mr. Gearheart had nowhere else to go. His only comfort was his dog. He had no one else. He told probation he was not doing well living with his mother, but he had no other place to go. In addition to constant degradation from his mother, he was frustrated; he couldn't keep a job, he was drowning in financial obligations, and he was still reeling from his first foray into federal Court. As detailed in his supervised release violation report, the incident for which Mr. Gearheart is here before this Court, started with his mother calling the police on him, and then withdrawing her complaint.

Probation Officer Sweeney succinctly captures the emotional distress Mr. Gearheart was under during this incident, "[a]t one point, it was this officer's opinion that Gearheart's attitude turned from being angry by raising his voice to

more of an emotional tone as he then appeared on the verge of tears and was observed to be visibly shaking." At 23 years old, Mr. Gearheart had been through the ringer, his home was not restful but traumatic, and he was so frustrated and upset, he was near tears in front of his probation officer.

This is not a man who wants to engage in criminal conduct. This is not a man who is violent. This is not a man who is part of the criminal underbelly of society. This is a lost boy. Such circumstances and background should mitigate against a severe sentence.

### III.   At 23 Years of Age at the Time of the Offense, Mr. Gearheart Should Receive a Downward Variance According to U.S.S.G. §5H1.1

The U.S. probation office recognized that Mr. Gearheart's youth warrants a downward variance. See ECF No. 45. U.S.S.G. §5H1.1 formally recognizes that people in their early 20s, even those who have been before the Court previously (as Mr. Gearheart has been) simply do not have the same ability to weigh risks and consequences not to control their impulses in the same way as an adult. Thus, they are not as culpable for their actions given as someone who is older in the same circumstances, with the same facts, and committing the same crime. The Guidelines formally enshrined such a variation from its normal terms of punishment to reflect reality and science.

> In line with the Commission's statutory duty to establish sentencing policies that reflect "advancement in knowledge of human behavior as it relates to the criminal justice process," 28 U.S.C. § 991(b)(1)(C), this amendment reflects the evolving science and data surrounding youthful individuals, including recognition of the age crime curve and that

cognitive changes lasting into the mid-20s affect individual behavior and culpability.

United States Sentencing Commission, <u>Amendments to the Sentencing Guidelines</u>, §5H1.1 (April 30, 2024).

Mr. Gearheart was only 23 when he committed this crime – a crime which would not have been illegal,[1] but for his recent conviction, which had been on appeal to the Fourth Circuit at the time of this instant offense. While it is easy for an outsider looking in to see just how, in frank terms, stupid it was to possess a firearm while on probation and now considered a felon; it is much harder for a 23-year-old, given the brain chemistry at his age, to realize how stupid and risky it is. The seriousness of the action and the potential consequences of such is just not seen as clearly. As the old adage goes, "youth is wasted on the young." As is understanding. Given the Guidelines' recognition of such, Mr. Gearheart's age at the time of this incident warrants a downward variance.

## IV.  *Prison Is Criminogenic and a Long Prison Sentence Is Not Necessary to Meet the Goals of Sentencing Under 18 U.S.C. § 3553*

It is not true that the longer the prison sentence, the more likely someone will be deterred from recidivism. The empirical evidence is almost unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to

---

[1] The firearm was indeed stolen, but possession of a stolen firearm is only a crime if it is knowing. Mr. Gearheart did not know it was stolen.

achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28- 29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any)marginal deterrent effects....... Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

Mr. Gearheart has already been in jail longer than he has ever been sentenced. He is facing additional time in federal prison. This is the first time he has served time as an adult, in an adult detention facility. That is qualitatively different than time served in a juvenile facility. The quality of the time served and the fact that the amount of time is drastically different from anything Mr.

Gearheart has faced before is a deterrent. An additional year more than what Defense is requesting (18 months) is not necessary to achieve a deterrent effect.

Society does not need to be protected from Mr. Gearheart. While he has broken the law, he is not dangerous. He is not violent. He has not engaged in behavior that is inherently dangerous to society (otherwise anyone owning a gun is inherently a danger to society).

Mr. Gearheart is close to completing his GED, he has been taking classes and preparation courses while in Roanoke City Jail, however, he needs a bit more time. While the BOP is typically not a place known for its rehabilitative ability, some limited time in the BOP will allow Mr. Gearheart to complete his GED, but any more time than needed for such completion will not serve any rehabilitative purposes and instead will be criminogenic.

> At the individual level, there is also some evidence that incarceration itself is criminogenic, meaning that spending time in jail or prison actually increases a person's risk of engaging in crime in the future. This may be because people learn criminal habits or develop criminal networks while incarcerated, but it may also be because of the collateral consequences that derive from even short periods of incarceration, such as loss of employment, loss of stable housing, or disruption of family ties.

Don Stemen, *The Prison Paradox: More Incarceration Will Not Make Us Safer*, 7-2017, CRIM. JUST.& CRIMINOLOGY, Loyola University, p 2.

Mr. Gearheart is a young man who has not been exposed to the world of adult prisons. It is not the place for him to learn non-criminogenic behavior. The longer he is exposed to the others in that situation, the more likely he is to learn the habits of older inmates or those who are in prison for more significant crimes.

7

Given that more time does not mean a greater likelihood of deterrence and given that society does not need prison time to be protected from Mr. Gearheart nor needs Mr. Gearheart to be incapacitated for a very long time, 30 months is greater than necessary to achieve the goals of sentencing.

## V.    *The Goal of Supervised Release Does Not Indicate A Need for More Than 6 Months Incarceration for the Violation*

Supervised release has always been meant for rehabilitative purposes.

Although Mr. Gearheart agreed that the 2024 edition of the Sentencing Guidelines apply to his sentencing, it bears noting the purposes of supervised release and probation and the recent updates to the Guidelines manual. Had Mr. Gearheart signed his agreement at the time of his sentencing, those updates would be formally reflected at his sentencing. Regardless, the reasoning behind the edits to the guidelines should apply here.

The new guidelines encourage a case-by-case examination in revocation proceedings rather than the automatic procedure for most alleged violations of supervised release conditions. U.S. SENTENCING COMM'N, Amendments to the Sentencing Guidelines, Apr. 30, 2025.

Even the Guidelines as currently written do not mandate revocation for a Grade B violation. However, the "new" guidelines reiterate what the purpose of supervised release has always been: rehabilitation, not punishment. "[P]robation serves all the goals of sentencing, including punishment, while supervised release primarily 'fulfills rehabilitative ends, distinct from those served by incarceration.'"

8

*United States* v. *Johnson,* 529 U.S. 53, 59 (2000). Mr. Gearheart understands that he violated the trust the Court put into him and he is therefore not arguing against revocation, however, he is asking that the Court sentence him to no more than 6 months for breaching that trust.

> Because supervised release is intended to promote rehabilitation and ease the defendant's transition back into the community, the Commission encourages courts – where possible – to consider a wide array of option to response to non-compliant behavior and violations of the conditions of supervised release.   These interim steps before revocation are intended to allow courts to address the defendant's failure to comply with court -imposed conditions and to better address the needs of the defendant while maintaining public safety. If revocation is mandated by statute or the court otherwise determines revocation to be appropriate, the sentence imposed upon revocation should be tailored to address the failure to abide by conditions of the court ordered supervision; imposition of an appropriate punishment for new criminal conduct is not the primary goal of a revocation sentence. The determination of the appropriate sentence on any new criminal conviction that is also the basis of the violation should be a separate determination for the court having jurisdiction over such conviction.

U.S.S.G. Chapter 7, Part C, Introductory Commentary.

Mr. Gearheart was a little over half way through his supervised release sentence, when he was found with a firearm and tested positive for THC and amphetamine/methamphetamine. Mr. Gearheart admits to using marijuana but maintains he has never knowingly used methamphetamine. It is clear from his supervised release violation report that Mr. Gearheart mostly complied with supervision but struggled with rehabilitation. It is no surprise. A young man in an unstable household, with no high school diploma, and now a felony – it would be difficult for anyone to maintain employment and discipline. He did use marijuana, which is federally illegal, but legal within the state of Virginia.

Struggling with reentering society is understandable and certainly not a reason to be thrown into prison. Although it is a hypothetical, it is likely Mr. Gearheart would not yet be facing revocation if not for the new charge and conviction of possessing a firearm, however, as discussed above, "imposition of an appropriate punishment for new criminal conduct is not the primary goal of a revocation sentence." The Court is separately sentencing Mr. Gearheart for the new criminal conduct, "the failure to abide by the conditions of the court," is separate.

Mr. Gearheart was not perfect on supervised release, but his attempts are laudable. Throughout his supervision, it is obvious his relationship with his mother was still fraught and volatile and yet, he continued to meet with his probation officer, apply to jobs, and attempt to pay back his obligations. Until March 2025, 14 months into his supervision, despite a fractured home life, Mr. Gearheart did not test positive for any illicit substances. The payments he made toward his fine are, in some ways, heartbreaking. He made payments in June 2024, after finally having somewhat stable employment. He forgot in July, which makes sense for someone in Mr. Gearheart's shoes, but then paid August and September. Despite losing his job in November, Mr. Gearheart still tried to pay what he could, contributing just $5 in December. This shows not only Mr. Gearheart's attempts to comply, but the desperate situation he was in. Most people would not blink an eye at $25 a month, but for Mr. Gearheart, that stretched his economic means.

As before, Mr. Gearheart needs help and rehabilitation. He needs to finish his GED, find a way to move on from his family situation, and maintain stable

10

employment. More than 6 months in prison for a violation of supervised release is far too punitive considering that the purpose of supervised release is rehabilitation.

## VI.    Conclusion

An additional year (or more) on top of what defense requests will do more harm to Mr. Gearheart than any good society will take from his sad story continuing much longer behind prison walls. 18 months for his conviction and 6 months for his violation is just, accounts for his mitigation, accounts for the seriousness of the offense, and ensures Mr. Gearheart finally has a chance to truly rehabilitate.

Dated: November 28, 2025

Respectfully submitted,
Andrew Bradley Gearheart

By:    _Beatrice Diehl_

Beatrice F. Diehl
Fl. Bar No. 0124667
Counsel for Defendant
Office of the Federal Public Defender
For the Western District of Virginia
210 First Street, SW, Suite 400
Roanoke, VA 24011
Ph. (540) 777-0891

**CERTIFICATE OF SERVICE**

I hereby certify that on November 28, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice, and constitute service, of such filing to all registered CM/ECF users.

_Beatrice Diehl_

Beatrice Diehl